**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT J. SACHS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:05CV106 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the applications of Robert J. Sachs for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. Plaintiff has filed a Brief in Support of Complaint. (Document Number 17). Defendant has filed a Brief in Support of the Answer. (Doc. No. 20).

### Procedural History

On February 19, 2003, plaintiff filed applications for a Period of Disability, Disability Insurance Benefits, and Supplemental Security Income, claiming that he became unable to work due to his disabling condition on January 16, 2003. (Tr. 84-88, 128-30). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated October 29, 2004. (Tr. 72-77, 89, 114-19, 436-47). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied after consideration of new evidence on April 23, 2005. (Tr. 498, 493-96). Plaintiff appealed the Commissioner's decision to the United States District Court for the Eastern District of Missouri.

On August 30, 2005, the court remanded the case to the Appeals Council to reconstruct the administrative record, consider new evidence, conduct a supplemental hearing, and issue a new decision. (Tr. 481-82). On September 23, 2005, the Appeals Council remanded the case to an ALJ for further action. On October 11, 2006, a supplemental hearing was held. (Tr. 42-46). On January 16, 2007, the ALJ rendered a decision in which he found that plaintiff was not under a disability as defined in the Social Security Act. (Tr. 8-13). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. Initial ALJ Hearing

Plaintiff's administrative hearing was held on April 14, 2004. (Tr. 16). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Susan Shea. (Id.). The ALJ admitted the exhibits into the record. (Tr. 17).

Plaintiff's attorney then provided argument regarding her theory of disability. (Id.). Plaintiff's attorney stated that plaintiff has problems with his lower back, hip, leg, right knee, neck, headaches, and heart. (Id.). Plaintiff's attorney noted that plaintiff has been diagnosed with fibromyalgia.[1] (Tr. 18). Plaintiff's attorney stated that plaintiff has tried medication, epidural injections, and physical therapy. (Id.). Plaintiff's attorney argued that plaintiff is unable to sustain

---

[1] A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown. Stedman's Medical Dictionary, 725 (28th Ed. 2006).

any work activity due to the degree and nature of his pain.  (Id.).

The ALJ then examined plaintiff, who testified that he was 43 years of age and was married.  (Id.).  Plaintiff stated that he lived with his wife and his fourteen-year-old son.  (Tr. 19).  Plaintiff testified that his wife works as a para-professional at East Carter R-2 School District.  (Id.).  Plaintiff stated that he has a GED.  (Id.).  Plaintiff testified that he is right-hand dominant.  (Id.).  Plaintiff stated that he is five feet, nine inches tall and weighs 180 pounds.  (Id.).  Plaintiff testified that he has never been in the military and that he has never been in jail or prison.  (Id.).  Plaintiff stated that he has never pled guilty or been found guilty of a felony.  (Tr. 20).

Plaintiff testified that he was receiving private disability insurance benefits from Standard Insurance Company in the amount of approximately $850 a month.  (Id.).  Plaintiff stated that his last job was at North Pacific Lumber Company in Van Buren, Missouri, driving a forklift.  (Id.).  Plaintiff testified that he stopped working as a forklift driver on January 16, 2003.  (Tr. 21).  Plaintiff stated that on that date, he fell on packed snow while working.  (Id.).  Plaintiff testified that he attempted to drive the forklift after he fell, but was only able to drive the forklift for five minutes due to pain.  (Id.).

Plaintiff stated that after he was injured, he switched to operating a planer, which is a machine containing lumber.  (Id.).  Plaintiff testified that he stood while operating the planer.  (Tr. 22).  Plaintiff stated that he had to remove lumbar from a chain and position it onto a conveyer belt where it was placed in the planer.  (Id.).

Plaintiff testified that he also worked driving a garbage truck for eleven and a half years.  (Id.).  Plaintiff stated that he stopped working at this position because he moved from Florida to Missouri.  (Id.).  Plaintiff testified that he started working at North Pacific Lumber when he

moved to Missouri.  (Id.).  Plaintiff stated that he worked for North Pacific Lumber for eleven and a half years.  (Tr. 23).

Plaintiff testified that he drove an automatic transmission vehicle at the time of the hearing.  (Id.).  Plaintiff stated that he also had a valid CDL at the time of the hearing.  (Id.).

Plaintiff testified that he smoked one and a half packages of cigarettes a day.  (Id.).

Plaintiff stated that he uses a cane for ambulation.  (Id.).  Plaintiff testified that Dr. Amjad Roumany, a rheumatologist, suggested that he use the cane in March of 2003.  (Id.).  Plaintiff stated that he did not obtain the cane until he felt that he could not walk without it, which was about a month and a half after Dr. Roumany recommended the cane.  (Tr. 24).  Plaintiff testified that he uses the cane to walk and to drive.  (Id.).  Plaintiff explained that he pushes his right foot down with the cane until he reaches cruising speed, at which time he uses the cruise control.  (Id.).  Plaintiff stated that when he pushes down with his right foot for an extended period of time, he experiences increased pain from his groin down to his knee.  (Id.).

Plaintiff testified that he does not cut his grass.  (Tr. 25).  Plaintiff stated that he lives in the woods and does not have enough grass to cut.  (Id.).  Plaintiff testified that he washes dishes, does laundry, vacuums, and helps around the house.  (Id.).  Plaintiff stated that he washed dishes for the first time in about two months the week prior to the hearing.  (Id.).  Plaintiff testified that he puts laundry into the washer and puts the soap in the machine but does not place the laundry into the dryer or fold the clothes.  (Id.).

Plaintiff stated that he does not hunt or fish.  (Id.).  Plaintiff testified that he used to fish but he does not have a current fishing license.  (Id.).  Plaintiff stated that for entertainment, he watches television.  (Id.).

- 4 -

Plaintiff testified that he is the Boy Scout leader for a troop in Van Buren.  (Id.).  Plaintiff stated that since he was injured, he has not been doing as much with the troop.  (Id.).  Plaintiff testified that he went camping with the troop and his son the month prior to the hearing.  (Tr. 26).  Plaintiff stated that the campground made accommodations for him so that he could drive his vehicle on the campgrounds.  (Id.).  Plaintiff testified that he slept in a three-man tent with an inflatable mattress.  (Id.).  Plaintiff stated that he camped for two nights.  (Id.).  Plaintiff testified that he camped at a Boy Scout-owned property located near Greenville, Missouri.  (Id.).

Plaintiff stated that he does not use alcohol or any type of street drugs.  (Id.).

Plaintiff testified that he was treated by a psychiatrist or psychologist as an adolescent in Illinois.  (Tr. 27).  Plaintiff stated that he was experiencing problems with his parents at that time.  (Id.).  Plaintiff testified that he saw a mental health professional for about a year.  (Id.).

Plaintiff stated that his pain is mostly in his groin, right buttocks, right leg down to his knee, middle back, low back, shoulders, and neck.  (Id.).  Plaintiff testified that his pain started in his middle and upper back and then went to his shoulders and neck.  (Id.).

Plaintiff testified that the last time he was out of state was a year prior to the hearing.  (Id.).  Plaintiff stated that he went to Little Rock, Arkansas with his wife and his son for a tae kwon do competition.  (Id.).  Plaintiff testified that his son takes tae kwon do.  (Tr. 28).

Plaintiff's attorney then examined plaintiff, who testified that he is able to sit for 15 to 45 minutes before he has to walk around due to severe pain in his right leg, groin area, and buttocks.  (Id.).  Plaintiff stated that he gets up, walks and leans against a wall to relieve his pain.  (Id.).  Plaintiff testified that he occasionally lies down on the floor and does physical therapy stretches.  (Id.).  Plaintiff stated that these measures relieve his pain to a certain degree and he is able to sit

down again.  (Tr. 29).

Plaintiff testified that he is able to stand or walk for ten minutes before he has to sit down, lean against a wall, or squat on his left leg.  (Id.).  Plaintiff stated that he squats on his left leg to take pressure off his right leg.  (Id.).  Plaintiff testified that he has to sit, lean against a wall, or squat for about five minutes before he can resume walking or standing.  (Id.).  Plaintiff stated that he is able to alternate sitting, standing, and walking throughout a day.  (Id.).  Plaintiff testified that he also receives relief during the day from physical therapy stretches.  (Tr. 30).

The ALJ then questioned plaintiff, who testified that he was participating in physical therapy at the time of the hearing.  (Tr. 30).  Plaintiff stated that he participates in one-on-one physical therapy at Ozark Physical Therapy.  (Id.).  Plaintiff testified that his physical therapy takes place in the water about half the time.  (Id.).  Plaintiff stated that his physical therapist writes progress notes.  (Id.).  Plaintiff testified that he has been in physical therapy since October of 2003.  (Id.).  Plaintiff stated that he attends physical therapy twice a week.  (Tr. 31).  Plaintiff testified that he also attended 28 physical therapy sessions at Hillsdale for workers' compensation, which was land therapy only.  (Id.).  Plaintiff stated that Ozark Physical Therapy is land therapy and aquatic therapy.  (Id.).  Plaintiff testified that Dr. Roumany suggested that he participate in water therapy.  (Id.).

Plaintiff stated that he receives Medicaid benefits, which covers the cost of physical therapy.  (Id.).  Plaintiff testified that he has a workers' compensation claim pending.  (Id.).  Plaintiff stated that workers' compensation is not paying for any of his medical treatment.  (Tr. 32).  Plaintiff testified that while he was employed, the insurance company paid for his treatment. (Id.).

Plaintiff's attorney then resumed examining plaintiff, who testified that he does not place clothes in the dryer because the bending causes him to experience low back pain. (Id.). Plaintiff stated that when he tried putting clothes in the dryer, he experienced a sharp pain in his back that lasted a couple minutes. (Tr. 33). Plaintiff testified that he then stopped what he was doing, sat down, and stretched. (Id.).

Plaintiff stated that he only vacuums a very small room, after which he has to stop and sit down due to low back pain, right leg pain, and groin pain. (Id.). Plaintiff testified that standing, pushing, and pulling the vacuum cleaner aggravates his pain. (Id.).

Plaintiff stated that on one occasion, he tried to carry firewood in the house. (Id.). Plaintiff testified that he had to walk up the stairs with the firewood while using his cane. (Tr. 34). Plaintiff stated that the firewood weighed ten to fifteen pounds. (Id.). Plaintiff testified that carrying the firewood increased his pain and forced him to sit down next to the furnace. (Id.). Plaintiff stated that he does not usually sit in regular chairs, but rather he sits in chairs that are close to the floor. (Id.).

Plaintiff testified that he has tried to cook, but standing at the stove aggravates his symptoms. (Id.).

Plaintiff stated that the trip he took for his son's tae kwon do championship was very hard on him physically. (Tr. 35). Plaintiff testified that he had to stop frequently to get out of the car and walk around. (Id.). Plaintiff stated that he squirmed when he was in the car. (Id.). Plaintiff testified that he had handicapped accommodations at the motel. (Id.). Plaintiff stated that he would have to stop and sit down while he was walking at the competition. (Id.). Plaintiff testified that he had to stand frequently and walk around when he was seated during the competition.

(Id.).

Plaintiff stated that on a typical day, his wife wakes him when she leaves for work and he either gets up or lies on the couch for another hour. (Id.). Plaintiff testified that when he gets up, he lets the dog out, then sits on his stool and does his stretches, which takes about two hours. (Id.). Plaintiff stated that he usually watches television while he does his exercises. (Id.). Plaintiff testified that he walks outside to get the dog, but otherwise sits most of the day. (Id.).

Plaintiff stated that he participates in activities with the Boy Scouts about once a month. (Tr. 36). Plaintiff testified that he supervises the boys while they participate in activities. (Id.). Plaintiff stated that he used to participate in Boy Scout events once a week for one hour, but since January of 2003, he has only been participating once a month. (Id.).

Plaintiff testified that the medications he takes dull his symptoms. (Id.). Plaintiff stated that his medications cause him to experience difficulty with concentration and comprehension. (Id.). Plaintiff testified that his wife complains that he does not hear her when she speaks to him due to the side effects of his medication. (Id.). Plaintiff stated that the hydrocodone[2] and diazepam[3] he takes cause these effects. (Id.).

Plaintiff testified that he has tried epidural steroid injections. (Id.). Plaintiff stated that the first injection caused him to feel nothing for three hours, after which he experienced 100 percent of his pain. (Id.). Plaintiff testified that the second injection provided no relief. (Id.). Plaintiff stated he workers' compensation would not pay for a third injection because the second one did

---

[2]Hydrocodone is indicated for the relief of moderate to moderately severe pain. See Physicians' Desk Reference (PDR), 509 (57th Ed. 2003).

[3]Diazepam is indicated for the management of anxiety disorder or for the short-term relief of the symptoms of anxiety. See PDR at 2964.

not provide any relief.  (Id.).

Plaintiff testified that his doctors have not recommended a course of treatment in which he has not participated.  (Id.).

Plaintiff stated that he has been unable to find a neurosurgeon who will treat him because he has Medicaid.  (Tr. 38).

Plaintiff testified that he has been treated by a vascular surgeon for heart problems in the past.  (Id.).  Plaintiff stated that he has undergone a stress test and an angiogram, which revealed a problem.  (Id.).  Plaintiff testified that the vascular surgeon was going to put a stint in his right leg because the artery had collapsed but the artery reopened so the stint was not necessary.  (Id.).  Plaintiff stated that the vascular surgeon recommended that he take an aspirin a day and quit smoking.  (Id.).

Plaintiff testified that he also experiences severe, migraine-like headaches.  (Tr. 39).  Plaintiff stated that he started taking the hydrocodone for his headaches and for upper back pain.  (Id.).  Plaintiff testified that his headaches were controlled by the hydrocodone until the last few years.  (Id.).  Plaintiff stated that the last time he experienced a severe headache was two days prior to the hearing, and the headache lasted all day.  (Id.).  Plaintiff testified that he experiences severe headaches approximately once a week, which last six to ten hours.  (Id.).  Plaintiff stated that he has learned to live with the headaches over the years.  (Id.).  Plaintiff testified that he is not as active when he has headaches and he turns out the lights in his house.  (Id.).  Plaintiff stated that he was able to work with the headaches when he took medication.  (Id.).  Plaintiff testified that he would be able to work with the headaches if that were his only problem.  (Tr. 40).

The ALJ indicated that he was not going to question the vocational expert.  (Id.).  The

ALJ stated that he was requesting a psychological evaluation with standard testing, as this was a "pain case." (Id.). The ALJ indicated that he would review the psychologist's report and then allow plaintiff's attorney to respond. (Id.). The ALJ stated that plaintiff could submit additional medical evidence as well. (Id.).

**B.**     **Supplemental ALJ Hearing**

Plaintiff's supplemental hearing was held on October 11, 2006. (Tr. 44). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Susan Shea. (Id.). The ALJ began by explaining the procedural posture of the case. (Id.).

Plaintiff's attorney stated that plaintiff underwent back surgery since the last ALJ's determination, which constitutes new and material evidence justifying reopening the determination. (Tr. 46). Plaintiff's attorney stated that this new evidence provides more insight into plaintiff's condition during the relevant period of time. (Id.). Plaintiff's attorney submitted additional medical records, which the ALJ admitted into the record. (Tr. 47). The ALJ indicated that he would leave the record open so that he could review the additional information. (Id.).

The ALJ then examined plaintiff, who testified that he was born on April 5, 1961, and received his GED. (Tr. 49). Plaintiff stated that he did not receive any other education or job-related training. (Id.). Plaintiff testified that he last worked on April 17, 2003, due to an injury he sustained on January 16, 2003. (Tr. 50). Plaintiff stated that he lived in Ellsinore, Missouri. (Id.). Plaintiff testified that he lives with his wife and seventeen-year-old son. (Id.).

Plaintiff stated that he has a driver's license. (Id.). Plaintiff testified that he did not drive to the hearing. (Tr. 51). Plaintiff stated that his wife drove him to the hearing. (Id.). Plaintiff testified that he last drove a vehicle a few days prior to the hearing. (Id.). Plaintiff stated that he

typically only drives a vehicle about once a month to go to the doctor. (Id.). Plaintiff testified

that part of the reason he drives infrequently is due to the availability of the vehicle. (Id.).

Plaintiff stated that the other reason he drives infrequently is because he takes medications. (Id.).

Plaintiff's attorney stated that he submitted a current list of plaintiff's medications. (Tr. 52).

Plaintiff's attorney then examined plaintiff, who testified that he was injured when he was

walking down a slight incline on packed snow at work. (Id.). Plaintiff stated that he fell forward

and landed on his left knee. (Id.). Plaintiff testified that he still has a Workers' Compensation

claim pending. (Id.).

Plaintiff stated that he recently underwent right hip surgery to repair a labral tear in his

right hip. (Tr. 53). Plaintiff testified that his doctor scheduled an MRI and an appointment with a

back surgeon to determine whether he is a candidate for back surgery. (Id.). Plaintiff stated that

he underwent hip surgery on March 6, 2005. (Id.). Plaintiff testified that he had been

experiencing lower groin pain due to the labral[4] tear in his hip. (Id.). Plaintiff stated that he still

experiences pain in his upper groin, right hip, right buttocks, right leg, and back. (Id.). Plaintiff

described his pain as stabbing and aggravating. (Id.).

Plaintiff testified that he has been using a cane for about three years. (Id.). Plaintiff stated

that the cane was suggested by Dr. Roumany. (Tr. 54).

Plaintiff testified that doctors in the neurosurgery department in Columbia, Missouri

determined what was wrong with his hip in the middle of 2005. (Id.). Plaintiff stated that the

doctors determined that he had a hip problem rather than a back problem and referred him to an

orthopedic surgeon. (Id.). Plaintiff testified that Dr. John Clohisy performed the hip surgery.

---

[4]Cartilage lining the socket of the hip joint. See Stedman's at 1038.

(Id.).  Plaintiff stated that his lower groin pain was attributed to the tear in his hip and the surgery almost completely eliminated his lower groin pain.  (Tr. 55).  Plaintiff testified that the pain in his upper groin, hip, lower back, and leg has increased since his surgery.  (Id.).  Plaintiff stated that his doctors told him that this pain was previously masked by the pain in his lower groin.  (Id.).

Plaintiff testified that he is unable to sleep in bed, walk long distances, or sit for prolonged periods due to his pain.  (Id.).  Plaintiff stated that he sleeps on stuffed pillows on the floor in an upright position.  (Id.).  Plaintiff testified that he usually sits on the floor because this is the most comfortable position for his right leg.  (Id.).  Plaintiff's attorney noted that plaintiff sat on the floor at one point during the hearing.  (Id.).  Plaintiff stated that he sits on a foot stool at home with pillows under his left buttocks.  (Id.).  Plaintiff testified that he does not place any pressure on his right buttocks because the pain increases.  (Id.).  Plaintiff stated that when he sits he keeps his right leg straight to help control the pain.  (Tr. 56).

Plaintiff testified that he does stretches he was taught in physical therapy to help control his pain.  (Id.).  Plaintiff stated that he does the stretches on a daily basis.  (Id.).  Plaintiff testified that he has not tried a TENS[5] unit.  (Id.).  Plaintiff stated that he takes hydrocodone four times a day for his pain.  (Id.).  Plaintiff testified that his medication causes him to experience memory loss.  (Tr. 57).  Plaintiff stated that he does not trust himself to drive when he takes his medication because he takes such a large dosage.  (Id.).

Plaintiff testified that elevating his leg helps the pain.  (Id.).  Plaintiff stated that he sits with his leg straight out and elevated.  (Id.).  Plaintiff testified that he elevates his leg about three times a day for five to twenty minutes.  (Id.).  Plaintiff stated that he never bends his leg.  (Id.).

---

[5]A method of reducing pain by passage of an electric current.  Stedman's at 1838.

Plaintiff testified that during the hearing, he was experiencing pain from his penis, into his groin, and down his leg. (Tr. 58). Plaintiff stated that he does not experience swelling in that area. (Id.).

Plaintiff testified that he has a bulged disc at the L4[6] and L5 levels of his back. (Id.). Plaintiff stated that he was also told that the nerves in the L4 and L5 and the nerve root had been damaged. (Id.). Plaintiff testified that he basically has a herniated disc at L4 to L5. (Id.). Plaintiff stated that he has a doctor's appointment to determine whether his condition is operable. (Id.). Plaintiff testified that his lower back is sore after he engages in any activity while standing. (Id.). Plaintiff stated that his lower back pain radiates down into his right hip. (Id.).

Plaintiff testified that he has undergone six injections in his back. (Tr. 59). Plaintiff stated that the injections did not help him. (Id.). Plaintiff testified that his last two injections helped his pain for one to two days. (Id.). Plaintiff stated that he also underwent two injections in his hip. (Id.).

Plaintiff testified that Dr. Stephen Segall completed a residual functional capacity assessment, which was submitted to the ALJ. (Id.). Plaintiff stated that Dr. Segall is his primary care physician. (Id.). Plaintiff testified that he sees Dr. Segall once every two months. (Id.).

Plaintiff stated that Dr. Clohisy performed his hip surgery. (Id.). Plaintiff testified that Dr. Clohisy was concerned that his problems may be caused by more than just the labral tear. (Id.).

---

[6]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

Plaintiff stated that Dr. Clohisy believes that his current problems with his hip are being caused by the nerves and discs. (Id.). Plaintiff testified that Dr. Clohisy has given up on him and has sent him to an associate, Dr. Heidi Prather, because he has more symptoms than those of a labral tear. (Id.).

Plaintiff stated that he has had neck problems since he was twelve years old but his neck is not his biggest problem now. (Id.). Plaintiff testified that he has worked his whole life with his neck problems. (Id.).

Plaintiff stated that he occasionally has difficulty urinating. (Tr. 61). Plaintiff testified that his doctors do not know if this is caused by his medication or his nerves. (Tr. 61).

Plaintiff stated that he has difficulty walking on uneven ground because he loses his balance. (Id.). Plaintiff testified that he requires assistance when he walks on uneven ground. (Id.). Plaintiff stated that he holds onto his son's shoulder when walking on uneven ground. (Id.). Plaintiff testified that one of his doctors recommended that he use a walker but he has not obtained one due to finances. (Id.).

Plaintiff stated that lifting weight affects his lower back. (Id.). Plaintiff testified that he can only lift five to ten pounds before it affects his lower back. (Tr. 62). Plaintiff stated that he could not lift five to ten pounds frequently during the day. (Id.).

The vocational expert, Susan Shea, then questioned plaintiff, who testified that he drove trucks when he worked in sanitation. (Tr. 63). Plaintiff stated that he also loaded objects at this position. (Id.).

The ALJ then questioned Ms. Shea, who testified that plaintiff's past work as a sanitation worker is classified as unskilled and very heavy. (Id.). Ms. Shea stated that plaintiff has also

worked as a forklift driver, which is classified as medium, low-level, and semi-skilled.  (Id.).

The ALJ indicated that he would leave the record open.  (Tr. 64).  The ALJ stated that he needed to make a determination on some jurisdictional issues and address the issue of missing evidence.  (Id.).  The ALJ indicated that he would either schedule a new hearing or issue his decision.  (Id.).

## C.    Relevant Medical Records

The record reveals that plaintiff was treated regularly for various chronic and acute complaints at Bay Medical Center of Dunedin, Florida, from 1993 through 1998.  (Tr. 385-426). Plaintiff consistently complained of headaches, back pain, shoulder pain, and neck pain.  (Id.). These complaints were treated with medication and manipulations, which resulted in some improvement.  (Id.).  Plaintiff was also consistently advised to quit smoking.  (Id.).

Plaintiff saw Kurt Zimmer, D.O. for treatment of headaches and back pain from June 1998 through July 1999.  (Tr. 368-82).  Dr. Zimmer diagnosed plaintiff with cervical, thoracic, and lumbar somatic dysfunction, chronic arthralgia[7] and myalgia,[8] headaches with possible migraine component, and insomnia.  (Id.).  Plaintiff was treated with medication and adjustments.  (Id.). Plaintiff reported that Neurontin[9] completely resolved his headaches.  (Tr. 374).

Plaintiff began seeing Stephen A. Segall, M.D. in October 1999, for various complaints. (Tr. 364).

Plaintiff presented to Three Rivers Healthcare on January 17, 2003, with complaints of

---

[7]Pain in a joint.  Stedman's at 159.

[8]Muscular pain.  Stedman's at 1265.

[9]Neurontin is indicated for the management of postherpetic neuralgia.  See PDR at 2565.

low back, right hip, and bilateral knee pain after slipping and falling on ice at work. (Tr. 284). Plaintiff underwent an x-ray of the lumbar spine, which revealed arteriosclerotic vascular disease,[10] but no evidence of fracture. (Tr. 289).

Plaintiff presented to Dr. Segall on January 29, 2003, at which time he reported that he had fallen on ice at work. (Tr. 351). Dr. Segall noted that plaintiff had an appointment with a vascular surgeon. (Id.).

Plaintiff saw M. Wayne Flye, M.D. on February 4, 2003, for a consultation regarding calcification[11] in his aorta. (Tr. 427). Dr. Flye's impression was calcification of abdominal aorta of no significance at this point in time. (Id.). Dr. Flye strongly encouraged plaintiff to stop smoking, alter his diet, and exercise. (Id.).

Plaintiff saw Robert J. Bernardi, M.D. on February 21, 2003. (Tr. 267-68). Plaintiff complained of bilateral knee pain and pain in the right buttock. (Tr. 267). Plaintiff reported some improvement since going to physical therapy. (Id.). Upon physical examination, range of motion of the right hip produced buttock pain but no groin pain. (Tr. 268). Straight leg raising was negative. (Id.). Plaintiff had full motor power in both lower extremities, normal motor tone, and no atrophy. (Id.). Dr. Bernardi noted that an MRI of the lumbar spine revealed minimal changes at the L4-5 and L5-S1 segments, no evidence of foraminal narrowing, and a very slight right sided disc bulge at L5-S1 without any type of nerve root impingement. (Id.). Dr. Bernardi expressed the opinion that plaintiff was able to continue work on a restricted duty basis. (Id.). He recommended that plaintiff continue with physical therapy. (Id.).

---

[10]Hardening of the arteries. Stedman's at 144.

[11]Hardening. See Stedman's at 287.

Plaintiff saw August Ritter, M.D. on March 6, 2003, upon referral by his workers' compensation carrier, for evaluation of bilateral knee pain. (Tr. 246). Plaintiff reported persistent pain and difficulty with ambulation. (Id.). Upon physical examination, plaintiff's knees were without effusion, warmth, or swelling. (Id.). Dr. Ritter found that plaintiff had significant symptom magnification with self-limited behavior and gait and range of motion. (Id.). Dr. Ritter noted that x-rays of plaintiff's knees were normal. (Id.). Dr. Ritter diagnosed plaintiff with bilateral knee pain with significant evidence of symptom magnification behavior. (Id.). Dr. Ritter recommended that plaintiff not squat or kneel, and not stand more than two hours a day. (Id.).

Plaintiff underwent an epidural steroid injection on March 14, 2003. (Tr. 326).

Plaintiff saw Dr. Ritter on March 20, 2003, at which time plaintiff continued to complain of right knee pain. (Tr. 243). Dr. Ritter found no edema, swelling, effusion or any other underlying structural abnormality. (Id.). Dr. Ritter's diagnosis was bilateral knee pain. (Id.). He recommended physical therapy. (Id.).

Plaintiff participated in physical therapy at Ozark Physical Therapy from January 2003 through February 2004. (Tr. 214-41).

Plaintiff saw Amjad Roumany, M.D. for a rheumatology initial evaluation on March 11, 2003. (Tr. 717). Plaintiff complained of chronic pain in his knees, hips, lower back, and shoulders since he was twelve years old. (Id.). Plaintiff reported increased pain involving his neck and shoulder with chronic headache for the past two years. (Id.). Plaintiff's medications were listed as hydrocodone, diazepam, ibuprofen, Aleve, and Elavil.[12] (Id.). Upon physical examination, plaintiff had a normal gait, no limitation of motion, pain on motion, crepitation, or

---

[12]Elavil is indicated for the relief of symptoms of depression. See PDR at 1417.

effusion of any joints in either the upper or lower extremities. (Id.). Plaintiff had SI joint[13] tenderness bilaterally. (Id.). Dr. Roumany indicated that an MRI of plaintiff's lumbar spine from February 2003 was consistent with mild degenerative joint disease.[14] (Id.). Dr. Roumany's assessment was chronic arthralgia in the shoulders, low back, knees, and buttocks with no inflammatory findings, synovitis,[15] or decreased range of motion. (Id.). Dr. Roumany recommended that plaintiff continue physical therapy for his lower back, obtain a CT scan of his SI joints, and take Elavil at bedtime. (Id.).

Plaintiff saw Dr. Roumany on March 20, 2003, at which time plaintiff reported no change in his symptoms. (Tr. 319). Plaintiff indicated that the Elavil helped his back pain. (Id.). Upon physical examination, plaintiff had no signs of synovitis, limitation of motion, or crepitation. (Id.). Plaintiff had multiple myofascial[16] tender points in his elbows, second rib, neck, trapezius[17] area, and lumbar spine consistent with fibromyalgia syndrome. (Id.). Dr. Romany's assessment was mild degenerative joint disease in the lumbar spine, normal MRI of the knee and cervical spine, and fibromyalgia syndrome. (Id.). He recommended that plaintiff continue Elavil at bedtime, add

---

[13]The SI, or sacroiliac joint, is the joint between the sacrum, at the base of the spine, and the ilium of the pelvis, which are joined by ligaments. See Stedman's at 1015.

[14]Degenerative joint disease is also known as osteoarthritis, which is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints, is more common in older persons. Stedman's at 1388.

[15]Inflammation of a joint; the same as arthritis. Stedman's at 1920.

[16]Of or relating to the fascia surrounding and separating muscle tissue. Stedman's at 1272.

[17]Extrinsic muscle of the shoulder. Stedman's at 1256.

Flexeril,[18] undergo a CT scan of the SI joints, and attend physical therapy. (Id.). Dr. Roumany stated that he did not believe plaintiff had an underlying connective tissue or inflammatory process. (Id.).

In a letter dated March 26, 2003, Dr. Segall stated that plaintiff suffers from an idiopathic[19] generalized arthritic condition afflicting his knees, shoulders, hips, and lumbar spine. (Tr. 291). Dr. Segall stated that plaintiff should refrain from lifting, bending, squatting, twisting, and prolonged standing. (Id.). Dr. Segall recommended that plaintiff take medical leave from employment for an indefinite time period. (Id.).

Plaintiff saw Dr. Bernardi on April 2, 2003. (Tr. 318). Plaintiff reported that the two epidural steroid injections he had undergone did not help with his symptoms. (Id.). Plaintiff complained of right-sided back pain that radiates through the buttock to the groin. (Id.). Upon physical examination, plaintiff had no lumbar deformities, negative straight leg raising, and some pain upon motion of the right hip. (Id.). Dr. Bernardi stated that plaintiff's right-sided back and groin symptoms may be due to SI joint dysfunction. (Id.). Dr. Bernardi noted that plaintiff has no clinical evidence of radiculopathy. (Id.). Dr. Bernardi expressed the opinion that plaintiff will be at maximum medical improvement after physical therapy. (Id.). Dr. Bernardi released plaintiff to work without restrictions regarding his lumbar spine. (Id.). He noted that plaintiff has some restrictions from Dr. Ritter regarding his knee. (Id.).

Plaintiff underwent a CT scan of his lumbar spine on July 8, 2003, which was normal. (Tr.

_____

[18]Flexeril is indicated for relief of muscle spasm associated with acute, painful musculoskeletal conditions. See PDR at 1897.

[19]Denoting a disease of unknown cause. Stedman's at 945.

311). No fracture, herniated disk, or stenosis was found. (Id.).

Plaintiff saw David Lee, M.D. for an evaluation of his lower back and right leg pain on August 15, 2003. (Tr. 346-49). Plaintiff complained of constant pain over the lower back and right buttock, with radiation down the posterior aspect of the right leg and the right groin area. (Tr. 346). Plaintiff also reported occasional numbness in the toes of the right foot and weakness in the right leg. (Id.). Plaintiff's neurological examination was remarkable for the presence of pain and spasm over the lumbar spine, mild postural tremor in the right hand, sensory impairment to pinprick on the lateral aspect of the right thigh, mild weakness of the right hip flexors, symmetrical deep tendon reflexes, flexor plantar responses, and a limping gait. (Id.). Dr. Lee stated that the MRI of plaintiff's lumbar spine was remarkable for moderate straightening of the lumbar lordotic[20] curve, degenerative changes at L5-S1, a possible annular tear at the L5-S1 level on the right, and absence of disk herniation. (Id.). Dr. Lee stated that his findings were not strongly suggestive of an active lumbar radiculopathy.[21] (Id.). Dr. Lee expressed the opinion that plaintiff's back and right leg pain was musculoskeletal in origin. (Id.). He recommended that plaintiff be continued on the same treatment regimen in addition to aquatic therapy. (Id.).

Plaintiff saw Matthew F. Gornet, M.D. for a spinal examination on August 25, 2003. (Tr. 321-22). Upon physical examination, plaintiff's range of motion of the hips was not productive for pain, testing was not productive for sacroiliac pain, his gait was normal, and straight leg raise was productive for right buttock and right hip pain. (Tr. 322). Dr. Gornet stated that he did not

---

[20]An anteriorly convex curvature of the cervical segment of the vertebral column. Stedman's at 1119.

[21]Disorder of the spinal nerve roots. Stedman's at 1622.

think that plaintiff had an SI joint dysfunction. (Id.). Dr. Gornet stated that he discussed with plaintiff that he could potentially be treated but he would have to be off all narcotics for a minimum of three months and be drug tested to determine if he had been compliant. (Id.). Dr. Gornet stated that this is the only way he would consider a new MRI scan and possible treatment. (Id.).

Plaintiff underwent an MRI of the lumbar spine on November 10, 2003, which revealed a small disc protrusion at L5-S1 without displacement of the L5 nerve root. (Tr. 306).

Plaintiff saw Dr. Roumany on December 22, 2003 for a follow-up visit. (Tr. 310). Plaintiff's medications were listed as hydrocodone, diazepam, ibuprofen, Aleve, and Elavil. (Id.). Upon physical examination, no synovitis was found and all joints showed full range of motion. (Id.). Plaintiff had diffuse myofascial tender points with no change in his knees, elbows, trapezius muscle, cervical spine, lumbar spine, and second rib. (Id.). Dr. Roumany's assessment was fibromyalgia syndrome and mild degenerative joint disease of the lumbar spine. (Id.). Dr. Roumany recommended that plaintiff continue aquatic therapy and water exercise and continue his medications. (Id.).

Plaintiff presented to Marylee Jennings-Pikey, Psy.D. on June 14, 2004, for a disability evaluation. (Tr. 195-205). Dr. Jennings-Pikey administered a number of psychological tests. (Id.). Dr. Jennings-Pikey stated that plaintiff may have a tendency to develop vague physical complaints under stress. (Tr. 204). She stated that plaintiff tends to rely on hysterical defenses of denial and repression in the face of conflict and may show a cheery presentation even when he is expressing physical complaints that would trouble others if they had them. (Id.). Dr. Jennings-Pikey found that any fears plaintiff reports are likely to be thought of as real to him and not

internally generated. (Id.). Dr. Jennings-Pikey diagnosed plaintiff with pain disorder[22] associated with both psychological factors and a general medical condition, chronic; and personality disorder;[23] and assessed a GAF[24] of 65.[25] (Tr. 204-05). Dr. Jennings-Pikey found that plaintiff is cognitively intact and his thought processes are within normal limits. (Tr. 205). Dr. Jennings-Pikey stated that plaintiff's memory is impaired for a simple memory task after a short delay with a distracter task, which may be due to his pain medications. (Id.). Dr. Jennings-Pikey found that plaintiff's judgment is reasonably within normal limits and his fund of knowledge is within normal limits. (Id.).

Dr. Jennings-Pikey completed a Medical Source Statement on June 17, 2004. (Tr. 209-10). Dr. Jennings-Pikey expressed the opinion that plaintiff had moderate limitations in his ability to understand and remember detailed instructions and carry out detailed instructions, and no limitations in his ability to understand and remember short, simple instructions; carry out short, simple instructions; and make judgments on simple work-related decisions. (Tr. 209). Dr.

_____

[22]A somatoform disorder in which pain is the predominant presenting symptom. Stedman's at 570.

[23]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control, and interpersonal functioning. Stedman's at 570.

[24]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[25]A GAF score of 61 to 70 denotes some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM-IV at 32.

Jennings-Pikey noted that plaintiff was unable to remember three words after a short delay, possibly due to his pain medications. (Id.). Dr. Jennings-Pikey found that plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting were not affected by his impairments. (Tr. 210). Dr. Jennings-Pikey noted that plaintiff had to stand, walk, and squat repeatedly throughout the four-hour exam. (Id.). Dr. Jennings-Pikey found that plaintiff's pain medications affect his memory. (Id.).

On July 20, 2004, plaintiff's physical therapist, Carrie Allen, stated that plaintiff has not benefitted from aquatic sessions. (Tr. 194). Ms. Allen indicated that plaintiff's reports of pain have remained the same and his functional mobility status has not changed. (Id.). Ms. Allen stated that plaintiff's gait and posture on land, and strength and flexibility have not improved. (Id.). Ms. Allen stated that she has seen no significant progress and therefore recommended that plaintiff be discharged from aquatic physical therapy. (Id.).

Plaintiff saw Ketan R. Bulsara, M.D. for a neurological consultation on November 8, 2004. (Tr. 697-700). Upon physical examination, no evidence of neurological dysfunction was found, sensory examination was intact, and plaintiff was able to bend over and touch his toes. (Tr. 699). Plaintiff had a positive femoral stretch test and tenderness to palpation on the right sciatic notch. (Id.). Dr. Bulsara indicated that an MRI performed in October 2004 revealed some evidence of lumbar spondylosis[26] concentrated at L4-5 and L5-S1, with no evidence of significant disc herniation, spinal narrowing, or stenosis. (Tr. 700). Dr. Bulsara stated that he could not attribute plaintiff's symptomatology to his radiographic findings. (Tr. 697). Dr. Bulsara stated

---

[26]Stiffening of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. Stedman's at 1813.

that plaintiff's symptoms were not neurosurgical. (Tr. 700). Dr. Bulsara recommended further work-up regarding his right hip. (Id.).

Plaintiff underwent an MRI of the right hip on November 12, 2004, which revealed a small right labral tear. (Tr. 712). Plaintiff underwent a CT scan of the pelvis and both hips, which revealed no abnormalities. (Tr. 710).

Plaintiff saw Parvin Behrouzi-Jareh, NP, at the University of Missouri Orthopaedic Clinic on December 29, 2004. (Tr. 692-94). Plaintiff was diagnosed with possible bursitis.[27] (Id.). It was recommended that plaintiff continue with physical therapy. (Id.).

Plaintiff returned to the Orthopaedics Clinic on January 21, 2005, with complaints of continued hip pain. (Tr. 691). Plaintiff was told that the tear in his hip labrum could possibly be causing him pain. (Tr. 691). Plaintiff was referred to an orthopedic surgeon in St. Louis. (Id.).

Plaintiff saw John C. Clohisy, M.D., at the Washington University Orthopaedic Surgery department, for an evaluation of his right hip pain on March 22, 2005. (Tr. 682-84). Plaintiff complained of pain in the hip, buttock, groin, and lateral hip, with radiation into the testicles. (Tr. 682). It was noted that plaintiff used a cane for ambulation. (Tr. 683). Upon physical examination, plaintiff ambulated with a severe limp and exhibited reduced hip range of motion. (Id.). Dr. Clohisy's impression was right hip pain. (Id.). He recommended further testing and administered a cortisone injection. (Id.).

Plaintiff saw Dr. Clohisy on April 19, 2005, for a follow-up regarding his right hip problems. (Tr. 674). Plaintiff complained of buttock pain, lateral hip pain, groin pain, and testicular pain, which were not relieved by the cortisone injection. (Id.). Dr. Clohisy's impression

---

[27]Inflammation of a bursa, which is a small sac of synovial fluid. See Stedman's at 281-82.

was right hip pain, arthrogram/MRI suggestive of labral tear.  (Id.).  Dr. Clohisy noted that plaintiff's symptoms were more pronounced than usually associated with this type of hip problem.  (Id.).  He recommended that plaintiff see a physiatrist to determine whether his lumbar spine is involved with his symptomatology.  (Id.).

Plaintiff saw Heidi Prather, D.O., at the Washington University Orthopaedic Surgery department on June 23, 2005.  (Tr. 667-68).  Dr. Prather's impression was right L5 radicular pain and right groin pain consistent with labral tear.  (Tr. 668).  Dr. Prather increased plaintiff's dosage of Elavil and ordered an MRI of his thoracic spine.  (Id.).

Plaintiff underwent nerve conduction studies and an EMG on July 25, 2005.  (Tr. 654-55).  Dr. Prather's impression was electrodiagnostic evidence of right L5 chronic changes.  (Tr. 655).  Dr. Prather recommended a right L5 injection.  (Id.).  Dr. Prather administered an epidural steroid injection at L5 on August 11, 2005.  (Tr. 649).  Plaintiff reported improvement in pain symptoms after the procedure.  (Id.).

Plaintiff presented to Donald S. Piland, M.D. for a disability evaluation at the request of the State agency on December 1, 2005.  (Tr. 640-42).  Upon physical examination, plaintiff exhibited extremely limited range of motion of the right leg.  (Tr. 642).  Plaintiff was able to get on and off the examining table with moderate difficulty.  (Id.).  He walked with a cane.  (Id.).  Plaintiff was unable to heel walk, toe walk, or squat.  (Id.).  Sensory examination revealed diminished sharp touch and pin prick sensation on the right side, with no atrophy.  (Id.).  Plaintiff's mental status was appropriate.  (Id.).  Dr. Piland's impression was traumatic herniated nucleus pulposus[28] at L4-L5 and L5-S1, right hip pain due to chronic bursitis and labral tear, and

---

[28]Extension of disk material into the spinal canal.  See Stedman's at 881.

suspected traumatic fibromyalgia.  (Id.).

Plaintiff saw Dr. Clohisy on December 13, 2005, for follow-up regarding his right hip problems.  (Tr. 626-27).  Upon physical examination, plaintiff was very sensitive, the hip exam was quite irritable, and plaintiff had a severe limp.  (Tr. 626).  Dr. Clohisy's impression was right hip labral tear with associated low back pain, buttock pain, and lateral hip pain.  (Id.).  Dr. Clohisy stated that a labral tear would not cause such severe symptoms.  (Id.).  Dr. Clohisy stated that plaintiff must have associated back disease.  (Id.).  Dr. Clohisy indicated that he would discuss the possibility of surgery with another physician.  (Id.).

Plaintiff presented to Dr. Clohisy for a follow-up regarding his right hip problems on January 24, 2006.  (Tr. 614).  Plaintiff continued to complain of severe right hip pain.  (Id.).  Dr. Clohisy noted that plaintiff had had mixed results with injections.  (Id.).  Dr. Clohisy stated that there is a 50 percent chance that plaintiff's pain would improve with surgery.  (Id.).  Dr. Clohisy indicated that he discussed the risks, complications, and benefits of surgery, and that plaintiff would like to proceed with surgery.  (Id.).

Dr. Clohisy performed a right hip arthroscopy[29] with partial labral resection and partial synovectomy[30] on March 6, 2006.  (Tr. 628-29).  Plaintiff tolerated the procedure well and had no complications.  (Tr. 629).

Plaintiff saw Dr. Prather on June 8, 2006, at which time plaintiff reported that the lower deep groin pain was markedly improved following surgery, although he now had lateral thigh and posterior buttock pain.  (Tr. 624).  Upon physical examination, plaintiff did not sit with his leg

---

[29]Endoscopic examination of the interior of a joint.  Stedman's at 162.

[30]Excision of a portion or all of the synovial membrane of a joint.  Stedman's at 1920.

straight out in flexion as he had previously.  (Id.).  Plaintiff walked with a cane in his left hand.

(Id.).  Dr. Prather's impression was status post labral debridement with degenerative chondrosis[31]
of the right hip; cannot rule out concomitant radicular pattern, L4 distribution.  (Id.).  Dr. Prather
administered an epidural steroid injection at L4.  (Tr. 623).

In a letter dated September 28, 2006, Dr. Segall stated that plaintiff has been disabled
since January 2003, and has not been able to work at a job nor perform many of his activities of
daily living.  (Tr. 606).  Dr. Segall stated that plaintiff requires help with work around the house
and with the care of his animals.  (Id.).  Dr. Segall indicated that plaintiff has explored all avenues
to explain his pain and repair the damage, but has been unsuccessful.  (Id.).

Dr. Segall completed a Physical Residual Functional Capacity Questionnaire on October 9,
2006.  (Tr. 602-05).  Dr. Segall stated that he sees plaintiff every other month for treatment of
cervical, thoracic, and lumbar spine pain with L4-L5 radiculopathy, fibromyalgia, and hip/groin
pain consistent with labral tear.  (Tr. 602).  Dr. Segall indicated that plaintiff's impairments are
expected to last at least twelve months and that plaintiff is not a malingerer.  (Id.).  Dr. Segall
stated that plaintiff's experience of pain is severe enough to constantly interfere with attention and
concentration.  (Id.).  Dr. Segall expressed the opinion that plaintiff can sit fifteen minutes at a
time, stand ten minutes at a time, and sit or stand a total of less than two hours in an eight-hour
working day.  (Tr. 603).  Dr. Segall found that plaintiff must shift positions at will from sitting,
standing, and walking, and requires unscheduled breaks several times an hour.  (Id.).  Dr. Segall
stated that plaintiff can occasionally lift and carry up to five pounds and can never lift and carry
more than five pounds.  (Id.).  Dr. Segall found that plaintiff was likely to be absent from work as

---

[31]Formation of cartilage.  See Stedman's at 369.

a result of his impairments or treatment more than four times a month.  (Tr. 604).  Dr. Segall also

noted that plaintiff should avoid temperature extremes, wetness, and humidity.  (Tr. 605).

**The ALJ's Determination**[32]

The ALJ made the following findings:

1.    The claimant met the disability insured status requirements of the Social Security
      Act on January 16, 2003, the date the claimant stated he became unable to work,
      and continues to meet them through December 2007.

2.    The claimant has not engaged in substantial gainful activity since January 2003.

3.    The medical evidence establishes that the claimant has neck strain, lumbar strain,
      arthralgia, a pain disorder with psychological factors, and a personality disorder,
      but that he does not have an impairment or combination of impairments listed in,
      or medically equal to one listed in Appendix 1 Subpart P Regulations No. 4.  The
      claimant does not have a severe mental impairment.

4.    The claimant's allegations of disabling symptoms precluding all substantial gainful
      activity are not consistent with the evidence and are not credible for the reasons
      specified in the body of the decision.

5.    The claimant has the residual functional capacity to perform work except for work
      that involves lifting over ten pounds or standing and walking more than two hours
      in an eight hour workday (20 CFR 404.1545 and 416.945).

6.    The claimant is not able to perform his past relevant work.

7.    The claimant has the residual functional capacity to perform a full range of
      sedentary work (20 CFR 404.1567 and 416.967).

8.    The claimant is 43 years old, which is defined as a younger individual (20 CFR
      404.1563 and 416.963).

9.    The claimant has obtained a G.E.D. (20 CFR 404.1564 and 416.964).

---

[32]The following is the initial decision of the ALJ dated October 29, 2004.  Following the
supplemental hearing, a different ALJ found that the evidence did not warrant the disturbance of
the analysis and summary of the facts rendered by the prior ALJ in the decision dated October 29,
2004.  (Tr. 12).

10. Considering the claimant's residual functional capacity and vocational factors, the issue of whether the claimant has transferable skills is not critical (20 CFR 404.1568 and 416.968).

11. Based on Rule 201.27, Table No. 1 of Appendix 2, Subpart P, Regulations No. 4, and the credible testimony of the vocational expert and considering the claimant's residual functional capacity, age, education, and work experience, he is not disabled.

12. The claimant is not under a disability, as defined in the Social Security Act and Regulations (20 CFR 404.1520(g) and 416.920(g)).

13. In light of the claimant's young age, steady work history, and inability to perform his past relevant work, the claimant should be referred to Vocational Rehabilitation for possible job training.

(Tr. 446-47).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the application filed on February 19, 2003, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under Sections 216(I) and 223, respectively, of the Social Security Act and is not eligible for Supplemental Security Income Benefits under Section 1614(a)(3)(A) of the Act.

In light of the claimant's young age, steady work history, and inability to perform his past relevant work, the claimant should be referred to Vocational Rehabilitation for possible job training.

(Tr. 447).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.     The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial

gainful employment." If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.      Plaintiff's Claims

Plaintiff raises three claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in assessing the credibility of his subjective complaints of pain and limitation.  Plaintiff next contends that the ALJ erred in formulating his residual functional capacity.  Plaintiff finally argues that the ALJ erred in failing to elicit vocational expert testimony.

## 1.      Credibility Analysis

Plaintiff argues that the ALJ erred in determining the credibility of his subjective complaints of pain and limitation.  Specifically, plaintiff contends that the ALJ made several factually incorrect statements in discussing the Polaski factors.

The undersigned agrees that the ALJ made several errors in conducting his credibility analysis.  "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies,

and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

First, the ALJ stated that plaintiff does not take strong pain medication. (Tr. 444). As plaintiff points out, this statement is incorrect. The medical record reveals that plaintiff was taking hydrocodone, diazepam, ibuprofen, Aleve, and Elavil at the time of his first administrative hearing. (Tr. 717). Plaintiff also testified at the administrative hearing that he was taking hydocodone and diazepam. (Tr. 36). Hydrocodone undoubtedly qualifies as a strong pain medication.[33] As such, the ALJ erred in finding that plaintiff's lack of strong pain medication is inconsistent with his subjective complaints of disabling pain.

Further, the ALJ did not discuss the side effects of plaintiff's medications. Plaintiff testified that his medications cause him to experience difficulty with concentration and comprehension. (Tr. 36). Plaintiff stated that his wife complains that he does not hear her when she speaks to him due to the side effects of his medication. (Id.). The side effects of plaintiff's medications are also documented in the medical record. Dr. Jennings-Pikey, the consultative psychologist, found that plaintiff's medications affected his memory. (Tr. 209-10). Dr. Jennings-Pikey noted that plaintiff was unable to remember three words after a short delay due to his pain medication. (Tr. 209). The ALJ's failure to discuss the side effects of plaintiff's medications was error.

---

[33]Hydrocodone is indicated for the relief of moderate to moderately severe pain. See PDR at 509.

The ALJ also stated that plaintiff does not seek regular and sustained medical treatment for his back, neck strain, and arthralgia. (Tr. 444). The medical record, however, reveals that plaintiff has been seeking regular treatment for these impairments since 1993. Plaintiff has consistently complained of these impairments, has been prescribed strong pain medication, has undergone epidural steroid injections, and has participated in physical therapy. Thus, the ALJ erred in discounting plaintiff's subjective complaints for his alleged failure to seek regular medical treatment.

The ALJ also noted that plaintiff has not required surgery or prolonged hospitalization. (Tr. 444). Although this statement was true at the time of the hearing, plaintiff has since undergone hip surgery and is being evaluated for back surgery. As such, plaintiff's failure to undergo surgery is no longer a factor that undermines his credibility.

The ALJ next stated that no treating or examining physician has reported that plaintiff is disabled. (Tr. 444). In a letter dated March 26, 2003, Dr. Stephen Segall stated that plaintiff suffers from an idiopathic generalized arthritic condition afflicting his knees, shoulders, hips, and lumbar spine. (Tr. 291). Dr. Segall stated that plaintiff should refrain from lifting, bending, squatting, twisting, and prolonged standing. (Id.). Dr. Segall recommended that plaintiff take medical leave from employment for an indefinite time period. (Id.). The ALJ found that Dr. Segall's statement was referring only to plaintiff's last job rather than all jobs. (Tr. 441). In a subsequent letter dated September 28, 2006, however, Dr. Segall stated that plaintiff has been disabled since January 2003 and has not been able to work at any job. (Tr. 606). As such, the absence of an opinion from a treating physician that plaintiff is disabled is not a factor that detracts from plaintiff's credibility.

The ALJ did properly discuss some <u>Polaski</u> factors. For instance, the ALJ found that plaintiff's activities, including serving as a scout master, going on a camping trip with the Boy Scouts, and traveling to Arkansas for a tae kwon do tournament in July 2003, were inconsistent with his allegations of disabling pain. The ALJ also pointed out that plaintiff continues to smoke one-and-one-half packages of cigarettes a day despite being advised by his physicians to stop smoking. Finally, the ALJ noted that plaintiff was fired from his last job rather than quitting due to disabling pain, which is inconsistent with his allegation of disability.

An administrative opinion must establish that the ALJ considered the appropriate factors. See <u>Holley v. Massanari</u>, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every <u>Polaski</u> factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the ALJ made several errors in discrediting plaintiff's subjective complaints of disabling pain. Thus, the ALJ's finding that plaintiff's complaints are not credible is not supported by substantial evidence.

## 2.     Residual Functional Capacity

Plaintiff next argues that the ALJ erred in formulating his residual functional capacity. Specifically, plaintiff contends that the ALJ did not consider all of his impairments and failed to give the opinion of plaintiff's treating physician the proper weight.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> [b]ased upon the totality of the evidence and giving the claimant the benefit of the doubt as to the severity of his impairments, the Administrative Law Judge finds that the claimant has the residual functional capacity to perform work except for work that involves lifting over ten pounds or standing and walking more than two hours in an eight-

hour workday. The medical evidence does not establish the existence of any other persistent, significant, and adverse limitation of function due to any other ailment. This residual functional capacity is supported by the collective medical records of Doctors Wyko, Bernardi, McVey, Gornet, and Ritter and Ms. Jennings-Pikey. It must be emphasized that in restricting the claimant to sedentary activity he has been given the benefit of the doubt.

(Tr. 445).

In determining plaintiff's residual functional capacity, the ALJ discredited the opinion of plaintiff's treating physician, Dr. Segall. In a letter dated March 26, 2003, Dr. Segall stated that plaintiff should refrain from lifting, bending, squatting, twisting, and prolonged standing. (Tr. 291). Dr. Segall recommended that plaintiff take medical leave from employment for an indefinite time period. (Id.). The ALJ found that Dr. Segall was only referring to plaintiff refraining from performing the lifting and prolonged standing of his former job, rather than all types of work. (Tr. 441). The ALJ stated that if Dr. Segall had meant that plaintiff was precluded from performing all types of work, his opinion would be inconsistent with his own treatment notes and the record as a whole. (Id.). The ALJ stated that Dr. Segall's treatment notes reveal that plaintiff had full muscle strength, normal sensation, normal gait, and full ranges of joint motion. (Id.). The ALJ also stated that Dr. Segall noted plaintiff had fair control of his low back symptoms and that his change of medication was helpful. (Id.).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be contrasted with the axiom that "[t]he opinion of a consulting physician who examines claimant

once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2)) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). An ALJ is free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson, 240 F.3d at 1148. Such opinions may also be discounted when a treating physician renders inconsistent opinions. See Prosch, 201 F.3d at 1013.

Plaintiff contends that the ALJ erred in discrediting the opinion of Dr. Segall. Dr. Segall had been plaintiff's treating physician since October 1999. (Tr. 364). Plaintiff saw Dr. Segall approximately once every two months for treatment of his various complaints. Dr. Segall's finding that plaintiff should refrain from lifting, bending, squatting, twisting, and prolonged standing is not inconsistent with Dr. Segall's own treatment notes. Dr. Segall had been treating plaintiff regularly for his lower back pain and had prescribed multiple medications for plaintiff's impairments.

Further, in a letter dated September 28, 2006, Dr. Segall stated that plaintiff has been

disabled since January 2003 and has not been able to work at a job nor perform many of his activities of daily living. (Tr. 606). Dr. Segall stated that plaintiff requires help with work around the house and with the care of his animals. (Id.). Dr. Segall indicated that plaintiff has explored all avenues to explain his pain and repair the damage, but has been unsuccessful. (Id.). Dr. Segall also completed a Physical Residual Functional Capacity Questionnaire on October 9, 2006. (Tr. 602-05). Dr. Segall stated that he sees plaintiff every other month for treatment of cervical, thoracic, and lumbar spine pain with L4-L5 radiculopathy, fibromyalgia, and hip/groin pain consistent with labral tear. (Tr. 602). Dr. Segall indicated that plaintiff's impairments are expected to last at least twelve months and that plaintiff is not a malingerer. (Id.). Dr. Segall stated that plaintiff's experience of pain is severe enough to constantly interfere with attention and concentration. (Id.). Dr. Segall expressed the opinion that plaintiff can sit fifteen minutes at a time, stand ten minutes at a time, and sit or stand a total of less than two hours in an eight-hour working day. (Tr. 603). Dr. Segall found that plaintiff must shift positions at will from sitting, standing, and walking, and requires unscheduled breaks several times an hour. (Id.). Dr. Segall stated that plaintiff can occasionally lift and carry up to five pounds and can never lift and carry more than five pounds. (Id.). Dr. Segall found that plaintiff was likely to be absent from work as a result of his impairments or treatment more than four times a month. (Tr. 604). Dr. Segall also noted that plaintiff should avoid temperature extremes, wetness, and humidity. (Tr. 605).

This evidence reveals that Dr. Segall believed plaintiff was incapable of performing any work, rather than just his former position, since January 2003. Although this evidence was not available at the time the first ALJ issued his decision, it was provided to the second ALJ prior to the supplemental hearing. Dr. Segall continued to treat plaintiff regularly for his impairments

following the first administrative hearing through the date of the supplemental hearing. Dr. Segall's opinion was not inconsistent with his treatment notes or those of any other providers. As such, Dr. Segall's opinion was entitled to substantial weight.

The first ALJ indicated that he was relying on the collective medical records of Doctors Wyko, Bernardi, McVey, Gornet, Ritter and Jennings-Pikey in determining plaintiff's residual functional capacity. (Tr. 441). Plaintiff saw Dr. Wyko for various complaints from 1993 through 1998, prior to plaintiff's work injury and alleged onset of disability. Dr. McVey interpreted the results of a myocardial perfusion scan in April 2003. (Tr. 441). Plaintiff, however, is not alleging a disabling heart condition. Marylee Jennings-Pikey is a consultative psychologist. Plaintiff is also not alleging a disabling mental impairment. Thus, the treatment notes of these providers are not relevant in determining plaintiff's residual functional capacity.

Plaintiff only saw Drs. Bernardi, Ritter, and Gornet on either one or two occasions. Plaintiff saw Dr. Bernardi in February 2003 and again in April 2003. (Tr. 267-68, 318). In February 2003, Dr. Bernardi noted that an MRI of the lumbar spine revealed minimal changes at the L4-5 and L5-S1 segments, no evidence of foraminal narrowing, and a very slight right-sided disc bulge at L5-S1 without any type of nerve root impingement. (Tr. 268). Dr. Bernardi expressed the opinion that plaintiff was able to continue work on a restricted duty basis. (Id.). In April 2003, plaintiff reported that the two epidural steroid injections he had undergone did not help with his symptoms. (Tr. 318). Plaintiff complained of right-sided back pain that radiates through the buttock to the groin. (Id.). Upon physical examination plaintiff had negative straight leg raising but exhibited some pain upon motion of the right hip. (Id.). Dr. Bernardi stated that plaintiff's right-sided back and groin symptoms may be due to SI joint dysfunction. (Id.). At that

time, Dr. Bernardi released plaintiff to work without restrictions regarding his lumbar spine, although he noted that plaintiff had some restrictions from Dr. Ritter regarding his knee. (Id.).

Plaintiff saw Dr. Ritter on two occasions in March 2003 upon referral by his workers' compensation carrier, for evaluation of bilateral knee pain. (Tr. 246). Dr. Ritter noted that x-rays of plaintiff's knees were normal. (Id.). He found that plaintiff exhibited symptom magnification with self-limited behavior. (Id.). Dr. Ritter diagnosed plaintiff with bilateral knee pain and recommended physical therapy. (Tr. 243). Dr. Ritter also found that plaintiff should not squat, kneel, or stand for more than two hours a day. (Tr. 246).

Plaintiff saw Dr. Gornet for a spinal examination on August 25, 2003. (Tr. 321-22). Upon physical examination, plaintiff's range of motion of the hips was not productive for pain, testing was not productive for sacroiliac pain, his gait was normal, and straight leg raise was productive for right buttock and right hip pain. (Tr. 322). Dr. Gornet stated that he had discussed with plaintiff that he could potentially be treated but he would have to be off all narcotics for a minimum of three months. (Id.). Dr. Gornet did not provide an opinion as to plaintiff's work-related restrictions.

The ALJ erred in relying on the opinions of doctors that plaintiff had only seen on one to two occasions and discrediting the opinion of treating physician Dr. Segall. In March 2003, Dr. Segall stated that plaintiff should refrain from lifting, bending, squatting, twisting, and prolonged standing. (Tr. 291). Further, Dr. Ritter found that plaintiff should not squat or kneel. (Tr. 246). The ALJ should have incorporated these restrictions in his residual functional capacity determination. The Physical Residual Functional Capacity Questionnaire Dr. Segall completed on October 9, 2006 revealed even greater restrictions, which Dr. Segall indicated were present as of

January 2003.  Although this evidence was available to the second ALJ at the supplemental hearing, the ALJ did not discuss it in his decision.

Further, the ALJ did not discuss all of plaintiff's impairments.  Plaintiff was diagnosed with fibromyalgia in March 2003.  (Tr. 319, 310).  The ALJ did not acknowledge this diagnosis.  The ALJ found that plaintiff suffers from lumbar strain and arthralgia.  (Tr. 440).  Since the initial ALJ determination, however, plaintiff has been diagnosed with a herniated disc with radiculopathy at L4-L5 (Tr. 642, 624, 602) and has undergone surgery for a labral tear (Tr. 628-29).  Although these conditions were not diagnosed until after the first ALJ rendered his decision, the evidence was available to the second ALJ and explains plaintiff's symptoms during the relevant period.  Any limitations resulting from these impairments were not incorporated into plaintiff's residual functional capacity.

In sum, the ALJ erred in discrediting the opinion of plaintiff's treating physician, Dr. Segall, regarding plaintiff's work-related restrictions.  The ALJ also failed to discuss plaintiff's diagnosis of fibromyalgia.  In addition, plaintiff was diagnosed with a herniated disc with radiculopathy at L4-L5 and has undergone surgery for a labral tear since the first ALJ rendered his decision.  The ALJ's residual functional capacity did not take into consideration limitations from these impairments.  Thus, the ALJ's residual functional capacity determination is not supported by substantial evidence.

**3.      Vocational Expert Testimony**

Plaintiff lastly argues that the ALJ erred by using the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because plaintiff has significant non-exertional impairments.  Plaintiff argues that he experiences significant pain as a result of his back

impairment and fibromyalgia and uses a cane for ambulation. Plaintiff contends that the ALJ's use of the Medical-Vocational Guidelines, commonly known as the "Grids," to determine that plaintiff was capable of performing other work, was error. Plaintiff argues that once a non-exertional impairment is shown to exist, vocational expert testimony is required.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999) (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics match those contained in grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are nonexertional, and who therefore cannot perform the full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a non-exertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony."

Id. (quoting <u>Talbott v. Bowen</u>, 821 F.2d 511, 515 (8th Cir. 1987)).

The undersigned finds that the ALJ committed error by not eliciting the testimony of a vocational expert. Plaintiff experiences significant pain due to his back impairments and fibromyalgia. Pain has been found to be a non-exertional impairment. <u>See</u> <u>Gray</u>, 192 F.3d at 802. Plaintiff also uses a cane for ambulation. In addition, Dr. Segall found that plaintiff is limited in his ability to sit, stand, bend, squat, stoop, must alternate positions at will, must take frequent unscheduled breaks, and must avoid temperature extremes. (Tr. 602-05). As such, plaintiff cannot perform the full range of sedentary work. The ALJ's finding that plaintiff was able to perform other work existing in significant numbers in the national economy in spite of his non-exertional impairments thus "invaded the province of the vocational expert" and was improper. <u>Foreman</u>, 122 F.3d at 26 (quoting <u>Sanders v. Sullivan</u>, 983 F.2d 822, 824 (8th Cir. 1992)).


## Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence. The ALJ performed a faulty credibility analysis in discrediting plaintiff's subjective complaints of pain and limitations; the ALJ's assessment of plaintiff's residual functional capacity was not based on substantial medical evidence in the record thereby producing an erroneous residual functional capacity; and the ALJ did not elicit the testimony of a vocational expert. For these reasons, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this __10th__ day of March, 2008.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE